The next case for argument is Roberto Quiles v. Alan Johnson Mr. Mattson May it please the court. I'm Gary Mattson from Des Moines, Iowa. I represent Mr. Quiles. We're here today seeking reversal from the Southern District's grant of summary judgment to the defendant, Alan Johnson. This is a negligence case arising out of a single semi-crash that occurred off I-80 in the Southern District of Iowa. The driver was Alan Johnson, the defendant. Mr. Johnson was an independent contractor with Swift Transportation. He was operating under the dispatch of Swift. Mr. Quiles was acting as his team driver. Mr. Quiles was an employee of Swift Transportation and was undergoing, going through his 200 hours of behind-the-wheel training before receiving his own Swift truck. Mr. Johnson fell asleep at the wheel, left the roadway, and crashed into an embankment. Mr. Quiles, who had been sleeping in the sleeper berth, was severely injured. The district court found that Mr. Quiles was acting as Johnson's employee, or actually special employee, at the time of the crash. And therefore, Mr. Johnson was immune from civil suit pursuant to Iowa Code Chapter 85.20, the exclusive remedy provision of Iowa's workers' compensation law. In order to prevail, Mr. Johnson, in order to prevail and receive immunity, Mr. Johnson would have to prove that he had an express or implied contract of hire with Mr. Quiles. Under our law in Iowa, whether an express contract or implied contract for hire exists is ordinarily one of fact. It can become a question of law when there is only one inference that can come from it. That's what the district court found. We're seeking reversal from that. There are genuine issues of material fact as to whether any implied contract existed and there are genuine issues of material fact as to whether any implied contract existed. The basic facts of this case... Mr. Quiles got his full workers' compensation remedy under Iowa law, right? He does, from Swift Transportation, yes, Your Honor. And has any Iowa court, to your knowledge, at least in an opinion, addressed the word apprentice in Section 85.61, sub 11? One case that I'm aware of, Your Honor, and that case is cited in our brief, and that is Henderson v. Jenny Edmondson Hospital. And in that case, the plaintiff was seeking workers' compensation benefits. She was going through a training program. She actually paid money to go to a training program to be like a nurse's aide, and she was injured. The hospital denied that she was their employee. As a secondary argument, she indicated that she was an apprentice. My recollection of what the Iowa Supreme Court held was that because she received no wages, she could not be an apprentice. And to Your Honor's point, I believe what 85.61, sub 11 really means is that apprentices... 85.61, sub 11? But the court decision, I don't understand it as you just described it. I read Parsons, I didn't read Henderson's yet. Well, Henderson... Why? I didn't even know from the briefs that it was an apprentice case, so... They said she was not an apprentice because she didn't receive any wages, is my recollection, and she wasn't paid by anyone. Isn't it more important, counsel, whether they're actually receiving training from the court to have an apprenticeship? I think that's a very good point, Your Honor. And in this case, as we've set forth, Mr. Quillis has testified that he received no training from Mr. Johnson. Well, I... Oh, sorry, go ahead. And in fact, they were team driving at the time, which that occurred because Mr. Quillis had had a previous mentor. He had already finished 50 hours of training by the time he was assigned to Johnson by Swift Transportation. That enabled him to team drive where one driver sleeps and the other drives. They drive 11 hours and rest 10 hours. And so, during that process, Quillis never received any training or instruction from Johnson. All of his instructions were coming from a Qualcomm system from Swift Transportation. They were dispatched by Swift. Swift had the authority for the loads and the routes. And if you look at the employment handbook that the defendants rely on significantly, those training requirements are the training requirements of Swift, not Johnson. This wasn't Alan Johnson's truck training school. They were Swift's requirements. Swift had a requirement that Mr. Quillis was supposed to drive a minimum of 40 hours a week. Well, that's federal law. Well, it's Swift's handbook. They have to have the same requirement. Well, possibly, Your Honor. But those rules that are set forth are Swift's. You know, I'd like to go back to Henderson for a moment because I didn't read Henderson the way that you described it. When I just looked at it, it doesn't say, I think, what you said. What it says is that Henderson paid for the privilege of being trained and didn't talk about whether she was paid or not paid. In fact, it noted that in ancient times under the common law, that apprentices were not ordinarily paid and that today they are customarily paid. But as I read it, well, I can read it to you. It says, here there is substantial evidence to support the Commissioner's finding that the plaintiff was not serving as an apprentice at the hospital. She paid a fee for the instruction and training. And that's a very different thing than I'm getting paid by Swift. Swift has a contract with Johnson. Swift has a contract with me. The two contracts, when read in its entirety, requires me to undergo this apprenticeship period. This apprenticeship period, I was assigned to Johnson. That seems different than I paid Johnson for the privilege of this training. Am I wrong? I don't think you're wrong. My concern on the apprenticeship language in 8561 sub 11 is I think that just means that apprentices can get work comp benefits. And as Judge Loken asked me, yes, Mr. Quillis, no matter how you define him, he's defined as a trainee, a student, a student trainee, a commercial driver trainee. He's getting work comp benefits from his employer, Swift Transportation. In order for Mr. Johnson to be his employer, he has to prove a contract expressed or implied. And I don't believe he is proven either. Yeah. And what was Judge Jarvie found the existence of two separate contracts which read together in an entirety created this express contract. And indeed he did. And they were relying on Mr. Quillis's acknowledgment of his employment at will with Swift and the handbook documents. Right. The handbook documents reference a mentor-mentee program, but doesn't mention anything about a special employment with that mentor. And I think it's significant because it's a handbook. The handbook cases in Iowa require a definite offer of employment. It seems to me your whole argument is basically rejecting the notion of dual employment in the world of comp exclusivity. I'm not rejecting dual employment, Your Honor. Well, it was after extra work comp benefits. No, that's not true. If there's a dual employer, then there's going to be comp exclusivity in both of them, but there's only going to be one set of comp. I mean, one or the other is going to provide the comp. Both are going to get the advantage in exchange for the payment of the comp system, the advantage of exclusivity. And your whole argument is, well, that can't be. Well, my whole argument is his immunity is based on his assertion that Mr. Quillis was his employee. We have cases all the time where we have a work-related accident. Okay, but that's just sort of tautology. The statute says an apprenticeship situation is a legitimate example of a dual employment, in which case both are employers, comp exclusivity applies, and one set of comp benefits are paid. That's what dual employment is all about. Well, I think dual employment is about having two employers, and I don't think that exists in this case. As I read your brief, are you arguing that at least on the express contract provision that, I keep saying Quillis, but you say his name is Quillis? I call him Quillis. Okay, because there's no evidence in the record that shows that he knew that an employer-employee relationship was being created between himself and Johnson, therefore he couldn't have an express contract, because you can't express a contract without knowledge of who the employer is. Absolutely. That's on the express side. Now, on the implied side, are you making the same argument, or is there something else? Well, the implied side, I think we have to look at a few factors in the record. When questioned about whether he had an employment agreement with Mr. Quillis, Mr. Johnson said no, that's at 156 of the joint appendix. There's no record he ever told Mr. Quillis that he employed him. Mr. Quillis did not believe that he was employed by Mr. Johnson. Then you look at the five factors, which are contained in the Henderson case, about factors as an aid to show whether such an implied employment agreement exists. And if you look at those factors, the first is the right of selection or control. In this case, or to employ at will, the right of selection, Johnson didn't select Mr. Quillis. Mr. Quillis was assigned to Johnson by Swift Transportation. The second element is responsibility of wages paid by the employer. Swift paid Quillis. Johnson did not pay Quillis. He didn't provide him with any employment benefits. What you're saying is that there weren't dual employers. It seems to me that whether Quillis understood the effect of signing up for the mentor program and being assigned to Johnson made him Johnson's employer for workers' comp purposes. I'm not surprised, he never thought about that, never focused on it. But that doesn't seem to me... If the statute is meant to say that a true apprenticeship is a legitimate dual employer situation for comp purposes, then that's what gets implied as a matter of law from these relationships. Well, I don't think that that's what the statute means, Your Honor. Well, obviously not. I think it just... The Parsons opinion reads as though we don't like this at all. Well, the Parsons, I think the Parsons case followed, and we certainly rely on Parsons, Parsons went through the five factors that I was going through that are those five factors that are applied in an aid to find if a contract to fire exists. And Mr. Johnson didn't have the right to terminate Mr. Quillis's employment with Swift. Swift retained that right. He had the right to terminate his relationship, his mentor relationship, his apprentice. He could have done that, yes. He could have dropped him off at a terminal. Well, that's the most significant... Well, I think that... Terminate his part of the dual employer relationship. I think the court in Parsons, as I recall, indicated that the Proctor and Gamble also had the ability to say, we don't want this person from Kelly Services working for us, but they couldn't terminate them either. The court addressed that, and I think if you look at those five factors, as Kelly, in the Parsons case, they reflect quite well compared to what we have here. See, I don't think a labor broker situation is like an apprenticeship situation here. I mean, a labor broker is just providing a workforce like a hiring agency. Well, in this case, too... It's not the same as here, where Swift is getting trainees experience with independent contractors so that they can ultimately be full employees of Swift. Correct. Labor brokers aren't doing that. They're just providing a workforce and pay for work and so forth. I think you've stated something that I've stated in one of our briefs as well, Your Honor, and I would say... What makes the factors really not fit in an apprenticeship situation? Well, I think the factors can fit in an apprenticeship situation. I mean, when you talk about apprenticeship or trainee, employers send people out for training all the time. I mean, my law firm does, to independent people to do software things, to learn how to do it from independent contractors. That doesn't make that person their employer if they negligently injure them. They don't automatically just flip off the switch and become an employee of somebody entirely new when they don't know about it. That's the difference with the apprenticeship. I see that my time's up. Ms. Kamler? Good morning. May it please the Court? My name's Christina Kamler. I'm from Omaha. I'm representing Alan Johnson. Today, I'm here to ask that this Court affirm the District Court's decision to grant Mr. Johnson summary judgment. Iowa Code 8520 specifically states that the exclusive remedy provision of the workers' compensation statute shall be the sole remedy of any employee or student. The Code goes on to provide and define employee as including an apprentice. I'd like to stop you right there because to me that's maybe the key to this whole case is a proper understanding of Iowa Code 85.61 Sub 11. Yes, Your Honor. And I know that in the first sentence of the summary of your argument, you recite what you just told us about that definition. But it seems to me we need to read the whole definition. And what it says is that an employee is a person who works under apprenticeship for an employer. So it seems to me the statute begs the question of whether there's an employer, which gets you back to the Iowa test for whether there's a clear and definite agreement. In other words, whether there's a contract. So the statute really doesn't tell us anything. Right. The statute does include within the definition of an employee an apprentice. And it does also refer to that language of requiring an employment contract. I think it also behooves us to think about just the general relationship of an apprentice and who's training them. An apprenticeship is defined as somebody who's receiving training in a trade and obtaining real life experience. If you look at the situation at hand, Mr. Quills was being trained. Yes, he was involved in SWIFT's training program, but the person directly overseeing him was Johnson. The handbook and the VIP materials make that very clear that Mr. Johnson was to perform regular reviews of Mr. Quills' work every 50 hours of driving that Mr. Quills completed. Johnson was to review his work on a two page performance schedule. So he was supposed to check off the boxes to make sure that Mr. Quills was learning certain tasks. Those tasks related to driving. They also related to doing paperwork for SWIFT as well as running the Qualcomm system. It didn't just involve driving. That's an important key issue that the Appellants Council seems to ignore. There's more to driving a truck than just driving a truck. SWIFT's training program involved and required that Johnson teach Quills all those skills. How could he do that if he was sleeping while Quills was driving? Certain tasks don't involve driving at all, like filling out the paperwork. Quills couldn't fill out the paperwork for SWIFT while he was driving either, but the two could sit down together and figure out how to fill out the paperwork properly. The same thing would go for running the Qualcomm system. They're not supposed to operate that system while they're driving. They're supposed to operate it while they're awake and the truck is not moving yet. So that's how that occurred. Your Honors, if I may, the very important documents in this case are the handbook and the VI paperwork. Those are in the record and very clearly demonstrate the expressed agreement of both parties. The handbook in particular is signed by Mr. Quills and shows his side of the bargain. He understood he would be in a mentorship program. There are parts of the handbook, particularly the payment portion, where it explains that he could be assigned to an owner-operated truck and everybody in the business understands that means he could be an independent contractor driving down the road, not a SWIFT employee. He understood that he would be trained by somebody or could be trained by somebody that was not a SWIFT employee but rather owned his own truck. If you go through the factual details, Quills understood that Johnson did own the truck. It wasn't a SWIFT truck that Johnson was driving. The case law goes into the five factors. One important detail to remember is that those five factors have to evaluate the relationship between Quills and Johnson, not the relationship between Quills and SWIFT. If you look at those five factors,  Johnson could affect Quills' wages. He got to dictate whether or not that truck went down the road and in doing so he affected Quills' hourly pay. Johnson, because he owned the truck, also controlled, at least to some extent, Quills' operations as he went down the road. He decided whether Quills picked up a certain load or not and whether or not Quills was allowed to drive the truck and receive his payments. The other factors also weigh in favor of finding that Johnson employed Quills. Johnson had the right to decide whether or not he would let Quills in his truck in the first place to be his student. So that being the case, Johnson did have the right to select Quills and that leads to that factor weighing in favor of finding an employment relationship. Johnson also directly affected the wages, as I stated earlier. Johnson had the right to discharge Quills. If Quills and him had an issue, Johnson could say he no longer wanted to train him. Quills was experienced with this. Quills had a previous mentor who decided to stop that relationship. I think it was a mutual decision between Quills and his previous mentor, Mr. Moussant, but they jointly decided to end that mentor relationship, which is when Quills was assigned to Johnson. Johnson also had a previous student that he decided he didn't want to train anymore. He had communication issues with him and so he discharged that student from his employee and decided to no longer train him. Johnson also directly benefited from Quills' work. Johnson paid a 5 cent per mile rate to have Quills on his truck. He was paid a mileage fee that was greater than that rate, so in effect he paid for Quills' services to go down the road and was receiving a higher rate of pay for every mile that Quills drove. So Johnson did directly benefit from Quills driving his truck. All of those factors weigh in favor of finding an employment relationship, but, Your Honors, I don't think you really have to get there because the two contracts signed by the two individuals involved in this matter, the handbook that was signed by Quills and the independent contractor agreement signed by Johnson demonstrate the parties' respective intentions and they demonstrate that Quills intended to be a mentor or, excuse me, a trainee, a student and Johnson intended to be a mentor and those two positions fall squarely within the Iowa statute's definition of an employment relationship and for that reason I think you need to affirm. Do you guys have any questions? Larson's Unworking Compensation Law is cited in the opposing counsel. Is that the best secondary authority from your standpoint? It is the best secondary authority and you will note in Larson they go into great detail about the dual employment relationship. They discuss very clearly that an employee can be employed by two people at the same time who are covered by one worker's compensation policy can benefit two employers at the same time and provide coverage to an employee independently at the same time. So I would suggest using that reference. Is there anything else? What do you think for an employer at the end of 85.6111 What do you think? It's at the end of a series of That is the key. It uses the Oxford comma and so it delineates that there are three types of relationships that fall within an employee relationship. So the language itself within that statute indicates that you can have somebody who is hired under contract to work you can have an employee who is specifically identified as an employee and you can have an apprentice. There's three types of relationships or individuals who fall within the category or definition of an employee. Would you agree that it's possible to have an apprenticeship where there's not an employer-employee relationship? Under this statute, no. I don't believe that's possible because the statute plainly uses the language. I think we have to give effect to the legislature's intent. I think they included that word for a reason and to be perfectly honest, the appellant hasn't brought forth a reason to not give effect to that word. Every apprentice is automatically an employee. Yes, I would say so. Under the statutory definition and just general statutory analysis you have to give effect and meaning to every word in the statute. Then where do we go for the meaning of apprentice? Well, if it's not further defined you would go to basic dictionaries like Webster's and I have included those definitions within my brief. They specifically define an apprentice as somebody obtaining a skill or learning a trade through the experience of working. Does it matter that Henderson cited to Black's Law Dictionary and then cited to Webster's as well and laid out those in seriatim? Are those controlling or do they have some interest to us or do we not care? I don't think they're controlling and there's case law saying they're not controlling. I believe Wilms and I believe Parsons say that they are not controlling factors. I believe you have to look at this from a statutory interpretation standpoint and interpret the statute to give it full meaning and effect. And I don't think you can ignore the word apprentice by just saying there has to be an employment relationship because if you do that, you're ignoring the statutory wording. Well, actually the statutory wording says or apprenticeship, for an employer. So it seems to actually tie to some kind of an employment relationship and then we come back into that Parsons presumption of sole employment rather than dual employment barring evidence establishing something otherwise, right? It is a bit circular, I will admit that. It is. But the way to really end, I think, is to give full effect to all words within the statute. You do have to give effect to employer but if you ignore the apprentice wording I don't think you can really do that. You have to give some effect to that word. And in 8520... I think the argument that's being made on the other side is that you don't ignore or not give effect to the word. What you're arguing is that apprentice for an employer is still tied together. And who is the employer? They're saying Swift, you're saying Johnson. I'm saying both. I'm saying it's a dual employment. You're right, exactly. And I think it has to be a dual employment. I think you can certainly use the factors for guidance. I think the factors come down on the side of finding employment when you particularly look at Johnson and Quill's relationship. I think Swift's relationship with Quill's is pretty irrelevant to the analysis. It does demonstrate the duality of the employment but it is only one side of the story. Well, it actually... the relationship has some bearing because but for Quill's relationship to Swift then Swift's independent contractor agreement with Johnson would be just a non sequitur. Right. It is a connecting mechanism to get the two parties together. I will certainly acknowledge that. And the other side would argue that that's precisely why it's a question for the jury, not for the judge. Why is that wrong? I believe that's wrong because the facts come out to show that Quill's understood he was being trained. He knew and understood he was a student at all times. He expressly confirmed he had to complete 200 behind the wheel hours with a mentor. And who's the mentor? It's Johnson. And with that being the case, if you have any other questions I'm happy to answer them. Otherwise, I think I've made my points. We're good? I'll give you two minutes for a bottle if you'd like. Thank you, Your Honor. I would just point out when I was going over the five factors that Iowa considers whether an implied contract exists I didn't get to the fifth factor which is the identity of the employer as the authority in charge of the work or for whose benefit it's performed. I think that's important in this analysis because it's very clear to me, at least, that Swift was the authority that was in charge of the work of both Johnson and Quillis. They dispatched the loads through their Qualcomm system. The load being hauled at the time of the wreck was a Swift load. There's no evidence that these two hauled anything but Swift. They were only together a few days. But Swift was the one controlling this operation and I think that's very significant in the analysis of this case is that they are the entity that is the authority in charge. Aren't you worried about making that argument that you're going to run flat into the fellow servant doctrine? Well, that's an issue that I've thought of is that these two fellows were acting more like co-employees than employer-employee, I understand. And that would be problematic because then we'd have to prove that he was grossly negligent. I think we can do that based on the testimony but that is something that's crossed my mind. If there are no other questions, that's all I have. Thank you. We ask that this matter be reversed and remanded for trial. Thank you.